[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10302
Non-Argument Calendar

_____

D.C. Docket No. 9:17-cv-80103-RLR

PATRICIA KENNEDY,

Plaintiff - Appellant,

versus

OMEGAGAS & OIL, LLC,
a Florida limited liability company,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 31, 2018)

Before WILSON, JORDAN, and DUBINA, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Patricia Kennedy ("Plaintiff"), who is disabled, sued Defendant-Appellee Omega Gas & Oil, LLC ("Omega Gas" or "Defendant") to compel it to bring its premises at the gasoline service station and convenience store into compliance with Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181–12189 ("ADA"). After a bench trial, the district court determined the majority of Plaintiff's complaint to be moot due to Defendant's remediation of the noncompliant structure or features and further held the alteration of the remaining barrier was not readily achievable. After reviewing the record and the parties' briefs, we affirm.

## I.    BACKGROUND

Plaintiff Kennedy is mobility impaired and ambulates by wheelchair; she also struggles with the ability to grasp or turn objects with her hands. Omega Gas owns and operates a gas station and convenience store located at 1974 South Congress Avenue in West Palm Beach, Florida ("the Property"). Walid Alsheikh is the managing member of Omega Oil.[1] Plaintiff visited Defendant's Property on January 14, 2017 and discovered several barriers that precluded her use of the Property and allegedly violated the ADA. Plaintiff documented evidence of the improperly marked and blocked handicapped parking space, including the placement of a dumpster and other barriers in the access aisle and faded blue paint

---

[1]    Plaintiff and Defendant do not dispute that Plaintiff is a disabled individual within the meaning of the ADA or that the Property is a place of public accommodation under the ADA.

to indicate the access aisle.  She further noted unsecured floor mats at the entrance

to the store and to the restroom.  Due to the various barriers at the Property,

Plaintiff was unable to enter the restroom but did observe several noncompliant

features of the bathroom, including:  the presence of a mop and bucket in the

middle of the floor; a pedestal sink, which would prohibit her from utilizing the

sink; sink and doorknob hardware in the shape of knobs, which require gripping

and twisting to operate; missing or improperly placed grab bars near the toilet; a

flush control on the incorrect side of the toilet; and a paper towel dispenser located

too high to be reached.  Plaintiff retained an ADA inspector, who visited the

property on March 20, 2017.

After filing her suit, Plaintiff revisited the Property on July 18, 2017 and

again faced multiple barriers.  While she did not attempt to access the bathroom on

this visit, she noted that the handicap parking space was poorly marked by faded

paint, that the access aisle was not clearly marked, and that furniture obstructed the

access aisle to the space.[2]

As the managing member of Omega Gas, Alsheihk operates the gas station

and store on a day-to-day basis and has the authority to make and to enforce

policies and procedures.  Omega Gas acquired the Property in 2002 but did not

know the age of the building.  Alsheihk further stated that, prior to this suit, he had

---

[2]    Plaintiff visited the Property for at third time in September 2017 but did not record any
notations of ADA violations at that visit.

not made any improvements to the Property, with the exception of replacing existing fuel tanks. He believed, however, that the Property was in compliance with the ADA based on annual inspections by the State of Florida as part of the State's lottery licensing system and because he had never received any complaints. After receiving Plaintiff's complaint, Alsheikh used his background in civil engineering to remedy the noncompliant features of the Property. To do so, he obtained a copy of the ADA statute and performed some of the work himself or with the assistance of a handyman or plumber. Prior to the Plaintiff's inspector's visit, Alsheikh took the following action: removed the floor mats from inside the store and the bathroom; installed new grab bars in the bathroom to meet requirements for length and height; replaced the hardware on the bathroom door and the sink with lever handles; replaced the toilet with the flush located on the top of the toilet; installed a new paper towel dispenser at the correct height; replaced the sink and moved it to the correct height; replaced the sign for the bathroom and the handicap parking space to meet ADA requirements; and moved the handicap parking spot to a space not obstructed by the dumpster. Alsheikh's improvements to the Property were ongoing when it was inspected by Plaintiff's expert.

Plaintiff's expert inspector, Carlos Herrera, routinely conducts inspections to ensure ADA compliance. He holds a bachelor's degree in civil engineering, a Florida general contractor's license, and a certification for accessibility and plan

4

review.  During his March 20, 2017, inspection, Herrera noted several noncompliant features of the Property.  He observed that it appeared that work was being done on the Property to make improvements, including the reassignment of the handicap parking space.  At his visit, however, furniture was sitting in the handicap space.  The signage was properly worded.  In the bathroom, Herrera detailed the following problems with ADA compliance: the sign was improperly placed; the door did not have sufficient maneuvering clearance; the flush control was located on the top of the toilet rather than the open side of the toilet; the toilet was located at an improper distance from the wall; the sink was one inch too high from the floor; and the bathroom did not have the requisite sixty inches of maneuverable floor space.  To obtain a compliant bathroom, the floor space would have to comply with either the circle or t-shape methods.  The circle method requires a sixty inch radius in all directions, while the t-shape requires four feet of clear floor space in one direction and three feet of clear floor space in the other direction.  In his report, Herrera estimated the noncompliant features could be remedied for approximately $7,075.  This estimate included a projected cost of $4,650 to remedy the lack of maneuverable floor space in the bathroom by moving a bathroom wall approximately three inches to achieve sixty inches of maneuverable space.  Herrera's estimate, however, did not factor in the actual mechanics of moving the restroom wall at the site; it reflects a cost analysis for a

5

simple separating wall based on an average of other sites he had visited in his career rather than a specific estimate for the actual Property. In addition, Herrera testified his assessment did not consider whether moving the wall to add three inches of floor space was readily achievable.

After receiving Herrera's report during discovery, Alsheikh continued to make alterations to the Property to bring it into compliance with the ADA. He added two more handicap signs to the bathroom, placing one on the latch side as required by the ADA. He also removed the door closer, which obviated the need for twelve inches of maneuvering space. He removed the new toilet with the flush control on the top and bought and installed a second toilet with flush controls on the open side. The new toilet was installed so that the center was the proper distance from the wall. The sink was lowered one more inch to be compliant with ADA requirements. The noncompliant bathroom finishes that were replaced—the sink, toilet, hardware, and paper towel dispenser—were thrown away. At trial, Defendant presented photographic evidence that all items noted in Herrera's report were addressed and fixed to ADA standards, with the exception of moving the bathroom wall to obtain three more inches of maneuverable space. In addition, Alsheikh instituted a new policy requiring Omega Gas's employees and tenants to keep the handicap parking space and bathroom free from any obstacles or obstructions, such as furniture left near the dumpster or cleaning supplies left in the

bathroom.  All parties were instructed to remove any barriers or obstructions left by customers promptly.

Alsheikh testified that he contacted two contractors to provide estimates for renovating the bathroom to meet the requirements for maneuverable space.  At trial, the contractors testified that they estimated the renovation would cost $80,000 or $85,950.  Neither contractor was familiar with the t-shape method of ADA compliance, and both based their estimates off of the circle method, which required moving a wall.  Both contractors recognized that the wall in question contained electrical, gas, and plumbing lines, and Alsheihk testified he would be required close the gas station and store during the renovation.  One of the contracting companies also suggested retaining an engineer, at an additional cost, for the project.

## II.    PROCEDURAL HISTORY

After a bench trial, the district court issued its Memorandum Opinion finding that Plaintiff was not entitled to judgment in her favor.  The district court found that Defendant had remedied all of Plaintiff's complaints, except for the maneuvering space in the bathroom, and that because the violations could not reasonably be expected to recur, they were moot.  The district court further found Plaintiff failed to meet her burden to prove that the widening of the bathroom by

moving the wall was readily achievable.  After entry of this order and the final judgment, Plaintiff timely appealed.

### III.    ISSUES

1.  Whether the district court erred in finding Plaintiff's claims, with the exception of the maneuverable floor space, were moot due to Defendant's remedial conduct.

2.  Whether the district court erred in finding Plaintiff failed to meet her burden at trial that the widening of the bathroom was readily achievable.

### IV.    STANDARD OF REVIEW

"Whether a case is moot is a question of law that we review de novo." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007). A district court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo.  *Wexler v. Anderson*, 452 F.3d 1226, 1230 (11th Cir. 2006).

### V.    ANALYSIS

We first address whether Defendant's remedial actions have mooted Plaintiff's claim and then turn to the question of whether Plaintiff carried her burden on the readily achievable analysis for the sole remaining barrier to ADA compliance.

## A. Mootness

This court may only entertain "Cases and Controversies" pursuant to Article III of the United States Constitution.  *See Sheely*, 505 F.3d at 1183 (quoting *Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1281–82 (11th Cir. 2004)). We have held "a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.  If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief, then the case is moot and must be dismissed." *Id.*  This doctrine, however, does not end our inquiry.  An exception to the case at hand requires our attention:  "The doctrine of *voluntary* cessation provides an important exception to the general rule that a case is mooted by the end of the offending behavior." *Id.* (emphasis in the original) (quoting *Troiano*, 382 F.3d at 1282).  The Supreme Court has spoken to this issue:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  If it did, the courts would be compelled to leave the defendant free to return to his old ways.  In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is *stringent*:  A case *might* become moot if the subsequent events made it *absolutely clear* that the allegedly wrongful behavior *could not reasonably be expected to recur*.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693 (2000) (internal marks, citations, and alterations omitted) (emphasis

9

added) (cited by *Sheely*, 505 F.3d at 1183–84).   The party asserting mootness carries the "formidable" and "heavy burden" of persuasion when asserting its conduct cannot reasonably be expected to recur.  *Sheely*, 505 F.3d at 1184.  In assessing this standard, this Court looks to the following factors:

> (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability.

*Id.*

After reviewing the record, including photographic evidence and the bench trial transcript, we conclude Defendant remediated each of the ADA violations noted by Plaintiff and her expert, Herrera—with the exception of the maneuverable floor space in the bathroom—and thus rendered Plaintiff's complaint as to these noncompliant features moot. Defendant's testimony, through its managing partner Alsheikh, indicated that its ongoing violations of the ADA were unintentional and erroneously founded on the belief that its Property was not in violation.  Alsheikh testified that the Property was inspected annually by the State for the purposes of its lottery licensure, and Omega Gas had never been informed of its noncompliance.  Plaintiff did not put forth evidence of a malicious or reckless disregard for the ADA or for any disabled customers.  In fact, the testimony

10

indicated Omega Gas had never before received a complaint that its Property was noncompliant. Thus, the first factor weighs in favor of Defendant.

The second prong involves Defendant's motivation behind the remedial changes to its Property. As we have stated before, "we are more likely to find that cessation moots a case when cessation is motivated by a defendant's genuine change of heart rather than his desire to avoid liability." *Sheely*, 505 F.3d at 1186. The record clearly demonstrates Omega Gas immediately began correcting any barriers or noncompliant features of its Property upon service of Plaintiff's complaint. Alsheikh testified that he obtained a copy of the ADA statute to educate himself as to the requirements and personally performed or oversaw all of the remedial work to ensure it was done correctly. Plaintiff's expert stated he observed work in progress when he visited the Property for his inspection, and Plaintiff herself did not note any noncompliant features during her third visit to the Property in September 2017, two months before the bench trial. Further, Defendant instituted new policies and procedures for its employees and tenants to follow regarding the monitoring of the handicap parking space and the proper storage of equipment to ensure movable barriers, such as the mop bucket or furniture, do not preclude access to or navigation around the Property. *Contra Sheely*, 505 F.3d at 1186 (noting that defendant's voluntary cessation occurred on the eve of trial after months of discovery and mediation) (*see also* cases cited

11

therein); *see also Nat'l Alliance for Accessibility, Inc. v. Walgreen Co.*, No. 3:10–CV–780–J–32–TEM, 2011 WL 5975809, at \*3 (M.D. Fla, Nov. 28, 2011) ("[f]ederal courts have dismissed ADA claims as moot when the alleged violations have been remedied after the initial filing of a suit seeking injunctive relief") (cases cited therein).

As to the third element, we conclude the Defendant acknowledged liability by admitting that the Property was noncompliant and by actively working to correct the noncompliant features.  Plaintiff's contention that Defendant never acknowledged liability is not supported by the record.  We conclude each factor of the *Sheely* test weights in Defendant's favor.

Plaintiff further argues Defendant should be subject to an injunction ensuring compliance with the ADA because the changes made are not permanent in nature and thus can reasonably be expected to recur.  We disagree.  Defendant's changes are mostly structural, in that they concern fixed features of the Property such as the sink, toilet, and grab bars.  Unlike in *Sheely*, which involved a discriminatory policy prohibiting the presence of service dogs at a radiology clinic, the changes here are more permanent in nature.  *Compare Sheely*, 505 F.3d at 1189 (finding the defendant could easily revert to a discriminatory policy and thus holding the case was not moot), *with Thomas v. Branch Banking and Trust Co.*, 32 F.Supp.3d 1266, 1271 (N.D. Ga. 2014) (finding that defendant's likelihood of

12

returning to discriminatory practice was highly unlikely based on the modification of installed equipment and machinery).  Alsheikh testified that he disposed of the old, noncompliant fixtures, and we note it would be an unorthodox business practice to spend thousands of dollars on purchasing and installing new fixtures (e.g., the toilet, sink, paper towel dispenser, grab bars, signage, and hardware) simply to rip them out and replace them with new, noncompliant fixtures.  *See Thomas*, 32 F.Supp.3d at 1271 ("Now that [BB&T] has spent time and money making the offending ATMs compliant, it cannot be reasonably expected that BB&T would undo that effort and spend additional time and money to purposefully return its ATMs to a state of noncompliance."); *see also Kennedy v. Nick Corcokius Enterprises, Inc.*, No. 9:15–CV–80642, 2015 WL 7253049, at *3 (S.D. Fla. Nov. 17, 2015).  Thus, we conclude Defendant has effectively remediated each of the ADA violations noted in Herrera's expert report, with the exception of the maneuverable floor space in the bathroom, and has thus deprived this court of jurisdiction under the mootness doctrine.

## B.  Readily Achievable

With regard to the lack of maneuverable space in the bathroom, Plaintiff contends Defendant failed to correct the issue, despite the fact that the bathroom wall could have been moved approximate three inches to achieve ADA compliance.  Both parties agree that the Property constituted an "existing facility"

13

rather than "new construction."  As this court has previously determined, "[t]he ADA imposes different requirements on the owners and operators of facilities that existed prior to [the ADA's] enactment date [in 1993]."  *Gathright-Dietrich v. Atlanta Landmarks, Inc.*, 452 F.3d 1269, 1273 (11th Cir 2006).  In an existing facility, "the ADA states that discrimination includes a private entity's 'failure to remove architectural barriers . . . where such removal is readily achievable.'"  *Id.* (quoting 42 U.S.C. § 12192(b)(2)(A)(iv)).  "Readily achievable" is defined under the ADA as "easily accomplished and able to be carried out without much difficulty or expense."  42 U.S.C. § 12181(9).  In establishing this standard, Congress included a list of factors to consider when evaluating whether the barrier removal is "readily achievable":

> (1) nature and cost of the action; (2) overall financial resources of the facility or facilities involved; (3) number of persons employed at such facility; (4) effect on expenses and resources; (5) impact of such action upon the operation of the facility; (6) overall financial resources of the covered entity; (7) overall size of the business of the covered entity; (8) the number, type, and location of its facilities; (9) type of operation or operations of the covered entity, including composition, structure, and functions of the workforce of such entity; and (10) geographic separateness, administrative or fiscal relationship of the facility of facilities in question to the covered entity.

*Gathright-Dietrich*, 452 F.3d at 1273 (citing 42 U.S.C. § 12181(9)).  In this action, Plaintiff and Defendant disagree on the burden of production.  Our case law, however, clearly speaks to this issue.  In *Gathright-Dietrich*, this court adopted the

14

approach set out by the Tenth Circuit in *Colorado Cross Disability Coalition v. Hermanson Family Ltd. Partnership*, 264 F.3d 999 (10th Cir. 2001). *See Gathright-Dietrich*, 452 F.3d at 1273. As we announced in that seminal decision:

> Under this approach [as established in *Colorado Cross*], the plaintiff has the initial burden of production to show (1) that an architectural barrier exists; and (2) that the proposed method of architectural barrier removal is "readily achievable," i.e., "easily accomplishable and able to be carried out without much difficulty or expense" under the particular circumstances of the case. If the plaintiff meets this burden, the defendant then bears the ultimate burden of persuasion that barrier removal is not "readily achievable."

*Id.* (internal citations omitted). The plaintiff's initial burden is not light. Rather, "a plaintiff must present sufficient evidence so that a defendant can evaluate the proposed solution to a barrier, the difficulty of accomplishing it, the cost implementation, and the economic operation of the facility. Without evidence on these issues, a defendant cannot determine if it can meet is subsequent burden of persuasion." *Id.* at 1274.

The facts considered and analysis conducted by the *Gathright-Dietrich* court are illustrative to the facts presented in this case. In *Gathright-Dietrich*, disabled persons sought alterations to The Fox Theatre, a historic theater and event space in Atlanta, Georgia. 452 F.3d at 1271. The court concluded the plaintiffs "submitted three proposed options relating to wheelchair seating, but they failed to produce any reliable evidence that those proposals were 'readily achievable.'" *Id.* at 1274.

15

Moreover, the proposed modifications "were non-specific, conceptual proposals that did not provide any detailed cost analysis," and the plaintiffs "failed to provide expert testimony to assure the feasibility of their proposed seating modifications and did not, in any meaningful way, address the engineering and structural concerns associated with their proposals[.]" *Id.* at 1274–75. Finally, the plaintiffs did not "produce a financial expert to link the estimated costs of their proposals with The Fox's ability to pay for them" and also "failed to take even the rudimentary steps of formulating what those estimated costs might be or providing any evidence of The Fox's financial position and ability to pay those costs." *Id.* at 1275. The court readily concluded the plaintiffs fundamentally failed to carry their initial burden that the proposed modifications were "readily achievable." *Id.*

The same can be said for this case. At trial, Plaintiff, through her expert, presented evidence that moving the bathroom wall to provide the required maneuverable space would cost an estimated $4,560. Herrera based this figure off of his past experience and the work he has performed as a contractor, and this estimate was described at trial as "a ballpark figure for moving a plumbing wall and a partition wall, new flooring, new ceiling, that is it." *See* R. 1253. During his testimony, Herrera admitted that he did not conduct any analysis as to the structure of the building, including the presence of plumbing, electrical, and gas lines or the material of the wall. *Id.* at 1263. Further, Herrera admitted that his estimate was

16

not specific to the Property but rather "an average based on other sites." *Id.* He further stated he failed to conduct a "readily achievable" analysis in preparing his report. *Id.* at 1263–64. Furthermore, Plaintiff failed to present any evidence as to Defendant's ability to fund this remediation—much less the $80,000 plus estimates Alsheikh received from contractors he contacted—or the effects that construction would have on the business (i.e., requiring the business to cease operations while gas, electrical, and plumbing lines were moved). In short, Plaintiff failed to carry her burden of proof by failing to provide "sufficient evidence for [Defendant to] evaluate the proposed solution," by utilizing only a generalized, non-specific proposal, and by failing to provide any semblance of a cost analysis.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's judgment finding Plaintiff's claim for all the ADA violations—excepting the maneuverable floor space in the bathroom—to be moot and ruling that Plaintiff failed to carry her burden in proving that remediation of the bathroom floor space was "readily achievable."

**AFFIRMED**.

JORDAN, Circuit Judge, concurring:

I agree in full with the majority opinion, but note that, even Ms. Kennedy met her initial burden of production on whether the bathroom modifications were "readily achievable," 42 U.S.C. § 12192(b)(2)(A)(iv), Omegagas & Oil likely met its burden of persuasion on this issue. *See generally Gathright-Dietrich v. Atlanta Landmarks*, 452 F.3d 1269, 1273 (11th Cir. 2006). Simply put, Ms. Kennedy's expert did not analyze what the costs of modification would be for the particular bathroom in question, and the contractors who provided estimates to Omegagas & Oil on the actual modification testified that the construction costs would be around $80,000. In addition, Mr. Alsheihk testified that the gas station would have to close for several days because the wall that had to be moved contained electrical lines.